UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>V.<br><br>DEMETRIUS THOMAS TAYLOR,<br>    Defendant. | CRIMINAL NO. 5:12-79-KKC-19<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

Defendant Demetrius Thomas Taylor is charged with five violations of the conditions of his supervised release. The magistrate judge conducted a preliminary and a final revocation hearing and issued a recommendation that the Court find the government has proved four of the alleged violations by a preponderance of the evidence. Taylor has filed objections to the recommendation, and the United States has filed a response to the objections.

In their briefs, neither party relies on evidence not presented at the hearings before the magistrate judge nor indicates that any new evidence has arisen since the hearings. Accordingly, in resolving the objections, the Court has relied upon the violation report and addendum issued by the United States Probation Office (USPO), the recordings of the preliminary and final hearing and the exhibits introduced, and the parties' briefs.

In the violation report, the USPO charges that Taylor violated four conditions of his supervised release:

   1) twice knowingly leaving the judicial district where he is

        authorized to reside without first getting permission from the Court or his probation officer (Violations 1 and 2);

2) communicating or interacting with someone he knew was engaged in criminal activity or communicating or interacting with a person with a felony conviction without first obtaining the permission of his probation officer (Violation 3);

3) not notifying the probation officer within 72 hours of being arrested or questioned by a law enforcement officer (Violation 4); and

4) unlawfully possessing a controlled substance (Violation 5).

At the preliminary hearing, the parties presented evidence on Violations 1-4. At the final revocation hearing, the parties agreed to rely on that evidence and, thus, they presented evidence on only Violation 5. The magistrate judge then issued a recommendation that the Court find that the United States proved by a preponderance of the evidence that Taylor committed Violations 1 to 4, but that the United States had failed to sufficiently prove that Taylor committed Violation 5.

As to Violations 1 and 2, Taylor himself testified that he traveled to Florida and Tennessee while on supervision without the required permission. Thus, Taylor does not object to the magistrate judge's determination that the United States proved by a preponderance of the evidence that he twice traveled outside of the Eastern District of Kentucky without permission. The Court will adopt the magistrate judge's recommendation that the Court find Taylor committed Violations 1 and 2.

As to Violation 5, the United States does not object to the magistrate judge's recommendation that the Court find the government failed to prove this violation by a preponderance of the evidence. Accordingly, the Court will adopt this recommendation.

Thus, the only real issues deal with whether the government has sufficiently proved

Violations 3 and 4. As to Violation 3 – communicating or interacting with someone that Taylor knew was engaged in criminal activity or with a convicted felon without the permission of his probation officer – the primary evidence consists of incriminating content found on Taylor's phone and Taylor's own testimony that attempted to provide innocent explanations for that content.

U.S. Probation Officer William DeMarcus testified that he reviewed two cell phones belonging to Taylor. One cell phone contained a group text whose members included a man named Jamon Ritter, Taylor, and Taylor's son. The group text was labeled "MTF" in Taylor's phone. DeMarcus testified that the Lexington Police Department is currently validating MTF as a street gang. The text messages referred to selling a "zip," which DeMarcus testified is slang for an ounce of marijuana. DeMarcus testified that other texts in the group refer to music and shooting rap videos. DeMarcus testified that Taylor is active in sending messages on the group text, but that he did not send or respond to any messages regarding the selling of the "zip."

The question here, however, is not whether Taylor was actually involved in the illegal activity discussed in the texts, but instead whether he was aware that some of the individuals in the group text were involved in that illegal activity. In his objections, Taylor concedes that the text conversations referred to illegal drug activity, but he argues that the United States presented no proof that Taylor read the texts or that the illegal activity (the selling of the marijuana) actually occurred.

The evidence showed, however, that Taylor is active on this group text. He reads the group texts at least in order to take part in conversations regarding music. Thus, it is more likely than not that Taylor read the text messages regarding the illegal activity. Taylor testified that he never read the text messages in the MTF group that involved criminal activity. He testified that

he only reads the text messages between the group that relate to music. Taylor provided no explanation, however, for how he is able to filter out the messages regarding music from those involving criminal activity without actually reading the messages first. In addition, the government need not prove that the group participants actually sold marijuana. The conversations among the individuals on the text group indicated to any reasonable reader they were engaged in such activity. When Taylor learned of that, he had an obligation to cease communication and interaction with those individuals. There is no evidence that he did.

In attempting to prove Violation 5 (possessing a controlled substance), the United States presented evidence of other incriminating content on Taylor's phone. At the hearing, Taylor and his girlfriend attempted to provide an innocent explanation for these photographs and texts. Accepting their testimony as true, it establishes further associations with other individuals engaged in illegal conduct.

For example, the United States submitted evidence that Taylor texted another individual to "bring my candles, I'll give you some weed." Taylor testified that these texts were with someone who sells candles to him. He testified that he did not really intend to pay the candle vendor in marijuana but that he knew the candle vendor is a "pothead" and the promise of marijuana would "entice" her to bring the candles he wanted. He testified that his candle vender is a habitual marijuana user. Thus, Taylor's own testimony establishes that he associated with this individual and that this individual habitually engages in illegal conduct.

The United States also submitted evidence that Taylor's phone contained pictures of marijuana and marijuana byproducts. At the final revocation hearing, April Smith, Taylor's girlfriend, testified that the illegal substances belonged to her daughter and that Smith took the pictures after discovering the substances in her daughter's room. Smith testified that she and

Taylor live together in the same residence as her daughter. Smith testified that she took the picture of the illegal substances on Taylor's phone because her phone was not working. She testified, however, that she called Taylor into the room after she found the illegal substances. She testified that Taylor is like a father to her daughter and the three had a conversation about the products found in the daughter's room. Smith testified that her daughter uses a significant amount of marijuana. In his objections, Taylor argues that he had no reason to know the marijuana was in the house. Taylor himself testified, however, that he was aware that Smith's daughter had marijuana in the house. Thus, accepting the testimony of Taylor and Smith as true, it establishes other instances of Taylor associating with an individual who he is aware engages in illegal activity.

The United States presented another text thread on Taylor's phone in which Taylor appears to explain to the text recipient why Taylor has not paid a debt he owes. In that thread, Taylor appears to state that the "trap" where the "money and dope" were located "got kicked in" and the "feds got 15." At the preliminary hearing, Taylor testified that a "trap" is a drug house. In his objections, Taylor explains that this text advised that "the place [the text sender] was going to get the money from had been raided and the money seized along with the drugs."

Taylor testified, however, that he did not send these texts. Instead, he stated, he let a friend named Cortez Johnson use one of his phones and it was Johnson who sent the text. He stated that Johnson was having some hard times and lived with Taylor for about a month. He testified that Johnson is now deceased. The texts were sent from Taylor's g-mail account, but Taylor testified that Johnson could easily use his g-mail account by simply opening the application on Taylor's phone. No password would be required. Again, assuming that this testimony is true, it establishes that Taylor associated with yet another individual engaged in

illegal activity.

Taylor testified that he had no idea, however, that Johnson was engaged in such activity. The Court finds it more likely than not that he did. Johnson actually lived with Taylor, and evidence of Johnson's illegal activity was on Taylor's own phone. Taylor testified that Johnson eventually returned the phone to Taylor, but that Taylor never read the texts. The evidence established that Taylor actively texts on his phone. The Court finds it more likely than not that he read any text conversations between Johnson and third parties. Moreover, the conditions of Taylor's supervision also provide that he cannot knowingly communicate or interact with a convicted felon without first getting his probation officer's permission. Taylor conceded on cross examination that he was aware that Johnson was a convicted felon. Yet he permitted Johnson to live with him without getting his probation officer's permission. This testimony establishes another violation of the terms of his supervised release.

In his objections, Taylor argues that the government did not prove that the text sender was engaged in selling drugs. Nevertheless, the text indicates to any reasonable reader that the sender intended to obtain funds that the sender knew were the proceeds of a drug trafficking operation in order to pay off a debt. Taylor confirms this in his objections explaining that the text advised that "the place [the text sender] was going to get the money from had been raided and the money seized along with the drugs."

As to Violation 4 – being questioned by law enforcement officers without timely informing his probation officer – the root of this violation is a birthday party that Taylor held at the Clarion Hotel for his 10-year-old daughter and a shooting that occurred at the hotel. Taylor testified that the party was a sleepover with about 15 children present ranging in age from 2 to 15. Jamon Ritter of the MTF text group is relevant to this violation also. Taylor testified that

Ritter often helps him set up events for children. He testified that Ritter helped set up for Taylor's daughter's birthday party, interacted with the children at the party for some time, and then left the hotel. Taylor testified that Ritter later returned to the hotel, but to an entirely different event. It was at this event that a shooting occurred.

Taylor testified that he did not witness the shooting, but that his 10-year-old daughter was outside the hotel at the time of the shooting and did see it. At some point, Taylor was asked to come to the front of the hotel because a law enforcement officer was talking to his daughter. U.S. Probation Officer DeMarcus testified that Taylor's interaction with the officer was brief. DeMarcus read the police report, which stated that the officer spoke with Taylor. The report stated that Taylor told the officers it was his daughter's 10th birthday and he had rented rooms at the Clarion to celebrate. In his testimony, Taylor conceded he had a "discussion" with the police after the shooting incident. He denied he was "questioned." He continues to make this argument in his objections. Taylor, however, explained to the officers why he and his daughter were at the hotel. The Court finds it likely that this explanation was preceded by at least one question addressed to Taylor.

In his objections, Taylor raises what appears to be an apparent contradiction in the conditions of his supervised release. As discussed, one condition is that he not knowingly communicate or interact with a person who has been convicted of a felony with first getting the permission of his probation officer. The second is that he "complete 200 hours of community service assisting fathers who have been convicted of controlled substance offenses, upon the direction and discretion of the U.S. Probation Office." There is no contradiction in these conditions. Both require that Taylor obtain the permission of his probation officer before interacting or communicating with a person convicted of a prior felony drug offense.

For all these reasons, the Court hereby ORDERS as follows:

1) the magistrate judge's Report & Recommendation (DE 1601) is adopted by the Court;

2) the Court finds that the government has proved by a preponderance of the evidence that Taylor committed Violations 1, 2, 3, and 4 set forth in the violations report; and

3) this matter is set for a Final Hearing for purposes of Allocution and to determine the appropriate sentence on **Monday, October 11, 2022 at 1:00 p.m. at Lexington, Kentucky.**

This 23rd day of September, 2022.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY